**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF WEST VIRGINIA
MARTINSBURG**

**ESTATE OF WAYNE A. JONES, by
Robert L. Jones and Bruce A. Jones,
Administrators of the Estate of Wayne
A. Jones,**

        Plaintiff,

**v.**                               **CIVIL ACTION NO.: 3:13-CV-68
(JUDGE GROH)**

**THE CITY OF MARTINSBURG,
WEST VIRGINIA, PFC. ERIK HERB,
PFC. DANIEL NORTH, PTLM. WILLIAM
STAUBS, PTLM. PAUL LEHMAN, and
PFC. ERIC NEELY,**

        Defendants.

<u>**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**</u>

Currently pending before the Court is the Defendants' Motion for Summary
Judgment. ECF 119. For the following reasons, the Court **GRANTS** this motion.

### I. Background

#### A. Facts

Many material facts in this case are undisputed because a magistrate court order
deemed admitted requests for admission submitted to the Estate. <u>See</u> ECF 75. In
addition, the evidence in the record independently supports the facts admitted by the
Estate.[1]

---

[1]     The Court notes when a material fact is disputed and considers all inferences drawn from the facts
in the light most favorable to the Estate. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574,
587 (1986).

At approximately 11:30 p.m. on March 13, 2013, Officer Paul Lehman of the

Martinsburg City Police Department was on patrol and saw Wayne A. Jones walking in

Queen Street, never on the sidewalk, for approximately one block.  Paul Lehman Dep. 5;

see also Defs.' Ex. 3, Lehman Video at 0:00-0:58; Req. for Admis. 5.[2]  The video from

Officer Lehman's vehicle depicts Jones wearing a big, loose coat.  Defs.' Ex. 3, Lehman

Video 0:00-0:58.  West Virginia Code § 17C-10-6(a) and City of Martinsburg Ordinance

371.06(a) prohibit a pedestrian from walking in a street when a sidewalk is available.  Jones

suffered from schizophrenia and was homeless.  Req. for Admis. 1.  Jones' brother, Robert

---

[2]      The Defendants' Exhibit 3 contains videos from the dashboard cameras of four of the five officers involved in this incident–Officers William Staub, Paul Lehman, Erik Herb, and Eric Neely.  There is no video from Officer Daniel North's vehicle because it did not have a dashboard camera.

The Estate questions the authenticity of the videos.  The Estate alleges that the West Virginia State Police materially altered the videos.  The Estate argues that, in light of the alleged material alteration, "all images captured by the camera's [sic] before the shooting are non-existent."  The Estate further avers that "it defies common sense to believe a police vehicle capturing the image at the scene of the shooting[] only started working during the time frame of the shooting, and not before the shooting."

Here, Chief Miller testified at his deposition that the state police combined Officer Neely's and Officer Herb's videos because only one video had audio of the incident.  Kevin Miller Dep. 41-42.  The result of the combination is that a video that did not have audio now has audio.  Chief Miller's testimony reveals that the state police did not remove or add anything to the audio and video, but simply combined it.  Simply put, the state police merely combined existing original audio to existing original video.  There is no evidence indicating the state police did anything more than that.  Finally, during Chief Miller's deposition, counsel for both parties had a conversation that further clarified that the Estate's counsel had all existing original videos in addition to the combined audio and video.  Id. at 43-44.

The content of the videos reinforces that the Estate's theory has no evidentiary support.  Directly contradicting the Estate's allegations, the videos contain images leading up to the shooting with no breaks in the timestamps.  They do not capture every detail of what happened between Jones and the officers by virtue of where the officers parked their vehicles and the timing of when each officer arrived.  Much of the altercation is not visible on Officer Lehman's video because he parked his car on Queen Street pointed away from where he approached Jones and did not move his car before the shooting occurred at another part of Queen Street.  Officer Staub's video does not show the altercation at the bookstore because he parked his car facing a direction slightly to the side of the main portion of the altercation.  This video does show portions of the activity at the scene consistent with the other videos.  Further contradicting the Estate's allegations, the videos from Officer Herb's and Officer Neely's vehicles reveal their approach to the scene and part of the altercation at the bookstore from the time they each arrived on the scene.  Accordingly, the Court rejects the argument that the videos are not authentic because all evidence in the record refutes the theory that images from the incident do not exist due to actions of the state police or the Defendants.

Furthermore, the admissions by the Estate and uncontradicted testimony independently support each other.  No genuine issue of material fact exists with regard to the videos.

Jones, testified in his deposition that an average person around Jones would not realize he had a mental illness.  Robert Jones Dep. 18.

Officer Lehman honked his horn to get Jones' attention.  Lehman Dep. 5.  Jones looked at Officer Lehman and continued walking.  Id. at 6.  Officer Lehman pulled his car over and exited it.  Id.  He asked Jones why he was walking in the street and requested identification.  Id.; Defs.' Ex. 3, Lehman Video at 1:19-1:39.  In his deposition, Officer Lehman could not recall Jones' response concerning why he was walking in the street, but remembered Jones stated that he did not have identification.  Lehman Dep. 5.

Officer Lehman then asked Jones if he could pat him down for weapons.  Id.  Jones responded: "What's a weapon?"  Defs.' Ex. 3, Lehman Video at 2:06-2:07; see also id.  Officer Lehman stated: "Any knives, guns, clubs, or that sort."  Lehman Dep. 5; see also Defs.' Ex. 3, Lehman Video at 2:08-2:11.  Jones replied: "Yes, I have something on me."  Defs.' Ex. 3, Lehman Video at 2:12-2:13; see also Lehman Dep. 5; Req. for Admis. 6.  Jones had a knife on his person.  Req. for Admis. 11.

Jones proceeded toward the rear of Officer Lehman's vehicle.  Lehman Dep. 6.  Officer Lehman ordered Jones to put his hands on the vehicle five times.  Defs.' Ex. 3, Lehman Video at 2:25-2:42; see also id. at 6-7.  Jones did not do so and continued to distance himself from Officer Lehman.  Lehman Dep. at 7.  Officer Lehman radioed for backup.  Id.  Officer Daniel North responded and observed Jones and Officer Lehman in what appeared to Officer North to be an argument.  Id.; Daniel North Dep. 5.  Officer Lehman deployed a taser at Jones.  Lehman Dep. 7.  The taser had little to no effect on him.  Id.  Officer North then deployed his taser at Jones, which also had a minimal effect.  North Dep. 5.

Then, Jones hit Officer Lehman on the head with his hands and pulled Officer Lehman's tobaggan over his eyes. Id. at 5-6; Lehman Dep. 7. Jones ran south on Queen Street approximately one block to a bookstore. Lehman Dep. 7; North Dep. 6. Officers Lehman and North pursued Jones on foot. Lehman Dep. 7. Officer Lehman called for backup again while Officer North radioed that he was pursuing Jones on foot. William Staub Dep. 6.

Officer North caught up to Jones in the entranceway of a bookstore on 145 North Queen Street. North Dep. 6. He ordered Jones to get on the ground. Id. He saw Jones' hands about to go up and believed that Jones could try to assault him. Id. Officer North swung at Jones, striking him in the neck. Id. By that time, Officer William Staub had arrived on the scene. Id. He ordered Jones to get on the ground. Id. at 7. Jones began to raise his hands, which Officer Staub interpreted as a fighting stance. Id. Officers North and Staub tried to grab Jones to arrest him. Id. When they reached for Jones' hands, Jones swung at Officer North. Id. Once they had a hold of Jones, all three men rolled down the stairs of the bookstore. Id. at 8; North Dep. 7. Jones struggled against the officers. Staub Dep. 8. Officer North deployed another taser on Jones, and Officer Staub put him in a choke hold. North Dep. 7; id.

By then, Officer Lehman, Officer Eric Neely, and Officer Erik Herb had arrived on the scene. Officer Neely saw Jones resisting Officer Staub's attempts to arrest him. Eric Neely Dep. 9. Officer Neely told Jones he would deploy his taser if Jones did not stop resisting arrest. Id. at 9; see also Defs.' Ex. 3, Neely Video at 1:19-1:20.[3] Jones did not

---

[3] The Defendants' Exhibit 3 and the Plaintiff's Exhibits B, C, D, and E are the videos from the vehicles of Officers Staub, Lehman, Herb, and Neely. The videos from the vehicles of Officers Staub, Lehman, and Herb have the name of the responding officer on the screen. The last video does not have Officer Neely's name on it, but, by process of elimination, it must be the video from his vehicle.

comply with this order. Neely Dep. 9; <u>see also</u> Req. for Admis. 10. Officer Neely deployed his taser on Jones, which had no effect. Neely Dep. 9.

While Officer Staub and Jones were on the ground, Officer Staub felt a scratch on his hand. Staub Dep. 9. One or two seconds later, he felt a sharp poke in his side. <u>Id.</u> Jones had stabbed Officer Staub with a knife. Req. for Admis. 7. Officer Staub then observed "a fixed blade knife" in Jones' right hand. Staub Dep. 10. Officer Neely saw Jones hit Officer Staub in the side with a weapon. Neely Dep. 10.

Neither party has produced the knife or explained what happened to it. But, at approximately 2:38 of Officer Staub's video, an officer states the knife was "right there in his hand, just leave it." In addition, the Estate admitted Jones had a knife. Req. for Admis. 11.

Officer Staub yelled: "He's got a knife, he's got a knife." Staub Dep. 10; <u>see also</u> Defs.' Ex. 3, Neely Video at 1:28. Around this time, Officer Lehman saw an object in Jones' hand. Lehman Dep. 8. The officers backed up from Jones by a few steps and drew their guns. <u>Id.</u>; North Dep. 7; Staub Dep. 11; Herb Dep. 20; <u>see also</u> Defs.' Ex. 3, Neely Video at 1:31-1:34. Officer Herb then saw the knife in Jones' right hand. Herb Dep. 8. In his deposition, Officer Herb described the knife as a kitchen knife having "probably a four or five-inch blade with a dark handle." <u>Id.</u>

The officers ordered Jones to drop the knife. Req. for Admis. 12; <u>see also</u> North Dep. 7; Staub Dep. 11; Defs.' Ex. 3, Neely Video at 1:34-1:37. Jones did not drop the knife. Req. for Admis. 13; <u>see also</u> Staub Dep. 11. Officers Staub and Lehman observed Jones attempting to get up. Staub Dep. 11; Lehman Dep. 32. The officers fired at Jones. Lehman Dep. 36; North Dep. 15; Staub Dep. 11; Neely Dep. 23; Herb Dep. 12.

Per the video from Officer Neely's dashboard camera, the shots lasted approximately two seconds and were fired almost simultaneously. Defs.' Ex. 3, Neely Video at 1:38-1:40. The officers fired twenty-two shots at Jones, which all struck him. The officers discharged rounds as follows: Officer Neely – four rounds, Officer Staub – three rounds, Officer Herb – five rounds, Officer North – two rounds, and Officer Lehman – eight rounds. The bullets hit Jones in the head, neck, arm, elbow, buttocks, back, and chest.

After the shooting ended, Officer Neely radioed that shots had been fired and requested emergency medical personnel. Other officers arrived on the scene and administered first aid until the paramedics arrived. The paramedics arrived and attempted to revive Jones. Their attempts failed. Jones died at the scene.

After Jones' death, a state grand jury investigated the incident. Officers Neely, Staub, Herb, North, and Lehman were placed on paid administrative leave. Miller Dep. 67. At first, the officers were required to stay home and attend court hearings as necessary for the grand jury investigation. Id. One month into their leave, the officers were allowed to return to the police station to perform administrative duties, such as maintenance at the station. Id. They were not permitted to take any law enforcement action. Id. In October 2013, the grand jury declined to indict the officers. Following that decision, the officers were permitted to perform law enforcement duties again. Id. at 68.

**B.     Procedural History**

After Jones' death, the administrators of his Estate (Jones' brothers, Robert L. Jones and Bruce A. Jones) filed suit on June 13, 2013 against the City of Martinsburg, West Virginia, the West Virginia Martinsburg Police Department, and Does 1 to 25. Their complaint raised four claims under 42 U.S.C. § 1983, a negligence and wrongful death

6

claim, and a claim under West Virginia Code § 61-6-21(b).  The Estate requested punitive damages for all claims.  On August 19, 2013, the Court entered an agreed order dismissing the Martinsburg Police Department from this case.

On September 3, 2013, the City filed a partial motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).  On September 24, 2013, the Estate filed a motion for leave to amend its complaint and amended this motion twice.  The amended complaint replaced the Doe Defendants with Officers Herb, North, Staub,[3] Lehman, and Neely.  It also modified the Estate's claims to the following.  The Estate brought two § 1983 claims against the officers, one under the Fourth Amendment for violating Jones' right to be free from excessive force and a second under the Fourteenth Amendment for violating the right of Jones' family members to maintain a relationship with Jones.  The Estate raised a § 1983 claim alleging the City is liable for the officers' constitutional violations.  Finally, the Estate maintained a negligence and wrongful death claim against the officers and a West Virginia Code § 61-6-21(b) claim against the City and officers.

On May 20, 2014, the Court granted the Estate leave to amend its complaint.  Then considering the motion to dismiss as addressed to the amended complaint, the Court granted the motion in part, dismissing the § 61-6-21(b) claim and the punitive damages sought against the City for the alleged § 1983 violation.

On August 8, 2014, the City and officers filed their Motion for Summary Judgment. The Estate filed a response, and the City and officers replied.

---

[3]         The amended complaint incorrectly names Officer Staub as William Staubs.

## II. Standard of Review

A court should grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Thus, a court determines "whether there is the need for a trial–whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Id. at 250.

The party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., 475 U.S. at 586. That is, once the movant has met its burden to show an absence of material fact, the non-moving party must come forward with affidavits or other evidence demonstrating there is indeed a genuine issue for trial. Fed. R. Civ. P. 56; Celotex Corp., 477 U.S. at 323-25; Anderson, 477 U.S. at 248. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249 (citations omitted). A court should deny summary judgment "if the evidence is such that conflicting inferences may be drawn therefrom, or if reasonable men might reach different conclusions." Phoenix Sav. & Loan, Inc. v. Aetna Cas. & Sur. Co., 381 F.3d 245 (4th Cir. 1967); see also id. at 253 (noting "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge").

8

## III. Discussion

The City and officers move for summary judgment on all remaining claims. The Court therefore will address each claim in turn.

### A.    Section 1983 Against the Officers for Excessive Force

The first § 1983 claim alleges the officers violated Jones' Fourth Amendment right to be free from excessive force. The officers argue that they are entitled to summary judgment on this claim and, alternatively, have qualified immunity from it.

Section 1983 provides a civil cause of action for state action that deprives a citizen of a right, privilege, or immunity secured by the Constitution or federal law. 42 U.S.C. § 1983. A claim that a law enforcement officer used excessive force in the course of an arrest or investigatory stop implicates an individual's Fourth Amendment right to be free from unreasonable searches and seizures.[4] Graham v. Connor, 490 U.S. 386, 394 (1989). Courts conduct an objective reasonableness analysis to determine whether an officer violated this right. Id. at 397. "The question is whether a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force." Anderson v. Russell, 247 F.3d 125, 129 (4th Cir. 2001) (quoting Graham, 490 U.S. at 395). Courts judge "[t]he 'reasonableness' of a particular use of force . . . from the perspective of a reasonable officer on the scene," not "with the 20/20 vision of hindsight." Graham, 490 U.S. at 396. When doing so, a court should focus "on the circumstances at the moment force was used." Elliott v. Leavitt, 99 F.3d 640, 642 (4th Cir.1996). As such,

---

[4]    The Estate maintains the Due Process Clause of the Fourteenth Amendment governs the excessive force claim. This clause applies when force is used on a detainee after he is arrested. Orem v. Rephann, 523 F.3d 442, 446 (4th Cir. 2008), abrogated on other grounds, Sawyer v. Asbury, 537 F. App'x 283, 290 (4th Cir. 2013). Because the officers never arrested Jones, the Fourteenth Amendment does not apply.

when assessing the use of deadly force, the analysis exclusively focuses "on the information known to the officer or officers '*immediately prior to and at the very moment [they] fired the fatal shot.*'" Pethel v. W. Va. State Police, 568 F. Supp. 2d 658, 667 (N.D.W. Va. 2008) (quoting Greenidge v. Ruffin, 927 F.2d 789, 792 (4th Cir. 1991)) (quotation marks and citations omitted).

The reasonableness inquiry requires examination of "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396. Courts must remember, however, "that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Id. at 396-97. Further, when deadly force is at issue like in this case, an "officer may use deadly force when the officer has 'probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or others.'" Anderson, 247 F.3d at 129 (quoting Tennessee v. Garner, 471 U.S. 1, 11 (1985)). "However, deadly force is not justified when it is used seconds after a passing threat has been eliminated 'if a reasonable officer would have recognized when the force was employed that the threat no longer existed.'" Pethel, 568 F. Supp. 2d at 667 (quoting Waterman v. Batton, 393 F.3d 471, 482 (4th Cir. 2005)).

Two cases in which the Fourth Circuit considered the use of deadly force warrant review before turning to the instant case.

First, in Elliott, the Fourth Circuit upheld police officers firing twenty-two times at Archie Elliott, finding the officers reasonably used "deadly force in response to an obvious,

serious, and immediate threat to their safety." 99 F.3d at 641. An officer had pulled over a car Elliott was driving. Id. Elliott smelled of alcohol and admitted he had been drinking. Id. After Elliott failed sobriety tests, the officer requested backup, handcuffed Elliott, and told him that he was under arrest. Id. The officer searched Elliott and did not find a weapon. Id. A second officer arrived on the scene. Id. Both officers placed Elliott in the front seat of a police car with the seatbelt fastened, door shut, and window closed. Id. As the officers stood next to the passenger side of the police car, they saw Elliott pointing a small handgun at them with his finger on the trigger. Id. at 642. One officer yelled, "Gun!" and commanded Elliott to drop the gun. Id. Elliott did not respond to the order. Id. The officers fired twenty-two bullets at Elliott, killing him. Id. In finding the officers reasonably perceived a serious threat to their safety, the Fourth Circuit emphasized Elliott was intoxicated and pointing a gun at the officers in close proximity to them. Id. at 642, 644. The Fourth Circuit also explained the district court erroneously focused on the number of shots fired when finding the officers used excessive force:

> The number of shots by itself cannot be determinative as to whether the force used was reasonable. Both officers fired almost simultaneously; neither officer emptied his gun; and the evidence indicates that the shooting took place within a matter of seconds. That multiple shots were fired does not suggest the officers shot mindlessly as much as it indicates that they sought to ensure the elimination of a deadly threat.

Id. at 643.

Next, in Sigman v. Town of Chapel Hill, 161 F.3d 782 (4th Cir. 1998), the Fourth Circuit upheld an officer's use of deadly force against a suspect who had a knife, Sigman. Officers had responded to a call reporting a domestic dispute. Id. at 784. When they arrived on the scene, Sigman's girlfriend told them that Sigman was out of control and had

a knife.  Id.  The officers knocked on the house's front door and spoke to Sigman.  Id.

Sigman threatened them and broke a window.  Id.  The officers attempted to calm Sigman,

but Sigman shouted obscenities, threatened to kill them, and swung at them with a knife

through a window.  Id. at 784-85.  Eventually, Sigman left the house with the knife in his

hand.  Id. at 785.  The officers ordered him to drop the knife.  Id.  Sigman did not drop it,

threatened the officers, and walked toward them.  Id.  When Sigman was ten to fifteen feet

from the officers, one officer fired two shots at Sigman, killing him.  Id.  Viewing all of these

circumstances, the Fourth Circuit held that the officer reasonably perceived Sigman as a

threat to the safety of himself and others.  Id. at 787.  The Fourth Circuit rejected the

plaintiffs' argument that disputes over whether Sigman had the knife when the officer fired

and whether the officer actually saw him holding it precluded summary judgment.  Id. at

788.  In doing so, the Fourth Circuit explained, first, that "a police officer need not, in all

circumstances, actually detect the presence of an object in a suspect's hands before firing

on him," and, second, it is not unreasonable to fire at a suspect "[w]here an officer is faced

with a split-second decision in the context of a volatile atmosphere about how to restrain

a suspect who is dangerous, who has been recently—and potentially still is—armed, and

who is coming towards the officer despite officers' commands to halt."  Id. (citation and

quotation marks omitted).

     Turning to this case, the Court first addresses several facts that the Estate argues

are disputed.

     First, the Estate argues whether Jones had a knife is disputed.  The Estate,

however, admitted Jones possessed a knife and additional facts concerning the knife–that

Jones stabbed Officer Staub with it, the officers ordered Jones to drop it, and Jones

refused to drop it.[5]  Req. for Admis. 11-14.  These admissions render Jones' possession of the knife undisputed.

Second, the Estate argues there is no evidence Jones failed to heed the officers' instructions, engaged in "unruly" actions, or otherwise attempted to evade the officers because the videos from their vehicles do not show such actions.  The Estate, however, admitted Jones did not comply with the officers' orders to stop fleeing, to stop resisting, and to drop the knife.  Id. 8-10, 13.  Given these admissions, the Estate cannot dispute whether Jones listened to the officers, evaded them, or took "unruly" acts.[6]

Finally, the Estate argues the videos do not reveal Jones attempting any violent actions.  The fact that Jones took a violent action is undisputed because the Estate admitted Jones stabbed an officer with the knife.  Id. 14.

The Court will now analyze whether each officer acted reasonably in light of the undisputed facts.

### 1.    Officer Staub

Officer Staub knew Jones was resisting arrest.   Indeed, Jones resisted Officer Staub's own attempts to arrest him.  Officer Staub also knew Jones had a knife and was willing to use it against the officers because Jones stabbed him with it and Officer Staub saw the knife in Jones' hand.  Further, Officer Staub knew Jones was commanded to drop the knife, did not comply with the order, and attempted to get up while still possessing the knife when the officers were in close range.

Objectively viewing these facts, Officer Staub was faced with a highly dangerous

---

[5]       Even so, the officers' depositions support this version of the events, and the Estate does not offer contrary evidence.

[6]       Again, the officers' deposition testimony supports these admissions regardless.

situation similar to the officer in <u>Sigman</u>–an individual armed with a knife who was resisting arrest, disobeying the officers' orders, and refusing to drop the knife despite the officers' commands to do so mere feet away from himself and the other officers.  <u>See</u> 161 F.3d at 785.  Making the threat of physical harm more significant, Jones showed he was willing to use the knife to harm the officers because he had stabbed Officer Staub.  Faced with this dangerous situation, Officer Staub reasonably viewed Jones as posing an immediate, serious threat to Staub's and the others officers' safety when he decided to fire.  His split-second decision to use deadly force therefore was objectively justified and reasonable. <u>See</u> <u>Anderson</u>, 247 F.3d at 129.

### 2.    Officer Neely

Officer Neely saw Jones resisting Officer Staub's attempts to arrest him.  Officer Neely knew Jones was not responding to non-deadly force as he warned Jones he would deploy his taser, Jones continued to resist arrest, and Jones did not respond to the taser when Officer Neely used it.  Officer Neely also knew that Jones had a knife and was willing to harm the officers with it.  Indeed, he saw Jones stab Officer Staub with a weapon, which a reasonable officer could identify as a knife when Officer Staub yelled Jones had a knife. Finally, immediately preceding his use of deadly force, Officer Neely knew that Jones was ordered to drop the knife and that Jones did not drop the knife when he was only a few feet from Neely and the other officers.

In light of all of these circumstances, Officer Neely had probable cause to perceive Jones as threatening immediate, serious physical harm to Neely and the other officers at the moment he fired.  Officer Neely was in close proximity to someone who not only was resisting arrest, but had a knife, demonstrated his willingness to use that knife to harm the

14

officers, and refused to drop the weapon despite the officers' commands. This created a highly dangerous, tense situation like in <u>Sigman</u>. <u>See</u> 161 F.3d at 785. Thus, Officer Neely acted reasonably in using deadly force in response to the threat of serious physical harm posed by Jones. <u>See</u> <u>Anderson</u>, 247 F.3d at 129.

### 3. Officer Herb

Officer Herb knew Jones was resisting arrest as he was on the scene when Officer Staub was attempting to arrest him. Although Officer Herb did not see Jones stab Officer Staub, he knew Jones had a knife because he saw the knife in Jones' hand. He also, like Officers Staub and Neely, was mere feet from Jones when the officers ordered Jones to drop the knife and Jones did not do so. Standing in close proximity to an individual resisting arrest who had a weapon and refused to drop it, Officer Herb reasonably viewed Jones as a serious threat of physical harm to Herb and the other officers. Thus, his decision to use deadly force was reasonable. <u>See</u> <u>id.</u>

### 4. Officer Lehman

Before reaching the bookstore, Officer Lehman knew Jones had a weapon because Jones told him that he did. Officer Lehman also knew Jones was continuing to resist arrest as he was present when Officer Staub was attempting to arrest Jones. Although there is no evidence that Officer Lehman identified the object he saw in Jones' hand as a knife before firing, the Fourth Amendment does not require that an officer actually see the weapon before employing deadly force. <u>See</u> <u>Sigman</u>, 161 F.3d at 788. Indeed, a reasonable officer in Officer Lehman's position would believe Jones had a knife. Officer Lehman entered this situation knowing Jones had a weapon. With that knowledge, Officer Lehman reasonably would credit Officer Staub's statement that Jones had a knife after

15

hearing that statement and seeing an object in Jones' hand. Further, like the other officers, Officer Lehman was mere feet from Jones when the officers ordered him to drop the knife and Jones did not do so. Given that he, too, was in close proximity to an armed individual who was resisting arrest and refusing to comply with orders, Officer Lehman had probable cause to view Jones as posing an immediate, serious threat of physical harm to Lehman and the other officers, justifying his decision to use deadly force. See Anderson, 247 F.3d at 129.

### 5. Officer North

Officer North knew Jones was resisting arrest and not complying with the officers' orders. Indeed, at the bookstore, Jones resisted the attempts of Officers Staub and North to arrest him. Officer North did not see the knife before firing at Jones. As noted, however, an officer need not actually see a suspect possessing a weapon to use deadly force. See Sigman, 161 F.3d at 788. Even so, the circumstances would lead a reasonable officer in Officer North's position to believe Jones was armed because Officer Staub yelled that Jones had a knife. Given that Officer North knew Jones had a weapon capable of inflicting serious harm on the officers, was resisting arrest, was ignoring the officers' orders, and did not drop the knife despite the officers' orders, Officer North reasonably perceived Jones as presenting an immediate, serious threat of physical harm to North and the other officers.[7] His decision to use deadly force therefore was objectively reasonable.

In sum, viewing all of the circumstances, the Court finds that a reasonable officer in each of the officers' shoes would have concluded that Jones posed an immediate threat

---

[7] The Estate takes issue with Officer North striking Jones in the neck. Officer North took this action because he feared Jones would assault him. It was not unreasonable to do so given the tense situation created by Jones' resistance to his and the other officers' orders and attempts to arrest him.

of serious physical harm to all of the officers.  See Anderson, 247 F.3d at 129.  The officers'
use of deadly force therefore was justified and reasonable.

In arguing that the officers used excessive force, the Estate stresses that the officers
fired twenty-two shots at Jones.  The Fourth Circuit has instructed, however, that the
number of shots fired is not "determinative as to whether the force used was reasonable."
Elliott, 99 F.3d at 643.  Indeed, in Elliott, the Fourth Circuit upheld the firing of the same
amount of shots that the officers fired at Jones.  Id.  In reaching that conclusion, the Fourth
Circuit focused on the near simultaneous nature of the shots, the fact that the officers did
not empty their guns, and the short duration of the shooting.  Id.  The circumstances in this
case are similar to Elliott.  The shooting took mere seconds, and the officers fired nearly
simultaneously.  There is also no indication that, in those few seconds, any officer saw
Jones drop the knife such that he would no longer pose a threat.  See Pethtel, 568 F. Supp.
2d at 667.  This is the very type of split-second decision that does not violate the Fourth
Amendment because the officers were in a tense, volatile situation where an individual was
armed, resisting arrest, and failing to comply with all of the officers' orders–including the
critical order to drop the knife.  See Graham, 490 U.S. at 396-97.  Viewing the officers'
actions in context, it was not unreasonable for five officers to fire a total of twenty-two
times.  Accordingly, the officers did not use excessive force.  The Court grants summary
judgment in their favor on this claim.

### B.     Section 1983 Against the Officers for Violating the Right of Jones' Family Members to Maintain a Relationship with Him

The next § 1983 claim alleges the officers violated the right of Jones' family
members to maintain a relationship with Jones.  The Estate claims the substantive due

process clause of the Fourteenth Amendment protects this right. The officers contend that they are entitled to judgment as a matter of law on this claim.

The Fourth Circuit held that the substantive due process clause does not encompass this right in Shaw v. Stroud, 13 F.3d 791 (4th Cir. 1994). In Shaw, a state trooper shot and killed a man. Id. at 794. The man's wife and children brought a § 1983 claim under the Fourteenth Amendment, arguing the trooper violated their right to the man's love and support. Id. at 798, 804. The Fourth Circuit explained that there are two types of substantive due process claims arising from state action that impacts family relationships. Id. at 804. The first type of claim occurs when the state's action directly injures the relationship, such as when the state removes a child from a parent's custody. Id. The second type of claim occurs when state action is not directed at the family bond itself, instead only incidentally impacting the familial relationship. Id. The claim of the wife and children fell into the second category because the trooper's act of shooting the man was unrelated to the familial relationship. Id. In considering whether this claim was cognizable, the Fourth Circuit held: "[B]ecause the Supreme Court has never extended the constitutionally protected liberty interest incorporated by the Fourteenth Amendment due process clause to encompass deprivations resulting from governmental actions affecting the family only incidentally, we decline to sanction such a claim at the present time." Id. at 805. Here, the Estate seeks to bring the very type of claim Shaw rejected. Accordingly, the Court grants summary judgment in the officers' favor on this claim because substantive due process does not encompass the right serving as its basis.

**C.      Section 1983 Against the City**

Because the Court found the officers did not use excessive force and the Fourteenth Amendment claim is not cognizable, the § 1983 claim against the City fails because there is no underlying constitutional claim for which it could be held liable.  See Hinkle v. City of Clarksburg, 81 F.3d 416, 420 (4th Cir. 1996) ("In the absence of any underlying use of excessive force against Wilson, liability cannot be placed on either the non-shooting officers, a supervisor, or the City."); see also Sigman, 161 F.3d at 788.  Accordingly, the Court grants summary judgment in the City's favor.

**D.      Negligence and Wrongful Death Against the Officers**

Finally, the officers move for summary judgment on the negligence and wrongful death claims.  The Estate did not address these claims in their response.

**1.      Negligence Claim**

West Virginia's Governmental Tort Claims and Insurance Reform Act immunizes an employee of a political subdivision from negligence liability unless: (1) he acted "manifestly outside the scope of employment or official responsibilities;" (2) he acted "with malicious purpose, in bad faith, or in a wanton or reckless manner; or" (3) another provision of the Act expressly imposed liability on the employee.  W. Va. Code § 29-12A-5(b); see also Pethtel, 568 F. Supp. 2d at 672.  There is no dispute that the Act applies to the officers because the Estate maintains the City employs them.  See Pl.'s Resp. at 3.

Here, the officers are immune from the negligence claim because none of the Act's three exceptions to that immunity apply.  The first exception is not implicated as the Estate admits the officers acted within the scope of their employment when they fired at Jones.  See Second Am. Compl. ¶ 7; id.  Second, the Court finds no evidence showing the officers

acted with malicious purpose, in bad faith, or in a wanton of reckless manner, particularly given the failure of the excessive force claim. See Pethtel, 568 F. Supp. 2d at 673 (finding, in a § 1983 excessive force action, second exception to officers' immunity from negligence inapplicable because the court previously found the officers did not use excessive force). Moreover, the Estate does not argue this exception applies in its response to the Motion for Summary Judgment. Finally, the Estate does not point to any provision of the Act that abrogates the officers' immunity. Accordingly, the Court holds that the Estate's negligence claim is barred as a matter of law and must be dismissed.

### 2. Wrongful Death Claim

"A showing of wrongful conduct, negligence, or default is required to prevail on a claim for wrongful death." Id. (quoting Bradshaw v. Soulsby, 558 S.E.2d 681, 687 (W. Va. 2001)). Here, first, negligence is not a basis for the wrongful death claim because the officers are immune from that claim. Further, because the officers' actions did not violate the Fourth Amendment or Fourteenth Amendment, the Estate cannot establish they engaged in wrongful conduct. See id. (dismissing wrongful death claim because it was predicated on dismissed § 1983 excessive force claim). Accordingly, the wrongful death claim fails as a matter of law because the Estate cannot establish the officers' liability for negligence or wrongful conduct.

### IV. Conclusion

For the reasons set forth above, the Court **GRANTS** the Defendants' Motion for Summary Judgment. Accordingly, the Court **DISMISSES** this action **WITH PREJUDICE**. The Court **ORDERS** that this case be **STRICKEN** from this Court's active docket.

It is so **ORDERED**.

The Clerk is directed to transmit copies of this Order to all counsel of record herein.

**DATED:** October 15, 2014

_____
GINA M. GROH
UNITED STATES DISTRICT JUDGE