# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
# MARTINSBURG

**ESTATE OF WAYNE A. JONES,**
**By Robert L. Jones and Bruce**
**A. Jones, Administrators of the**
**Estate of Wayne A. Jones,**

      Plaintiff,

v.                               **CIVIL ACTION NO.: 3:13-CV-68**
                                         **(GROH)**

**THE CITY OF MARTINSBURG,**
**WEST VIRGINIA, PFC. ERIK HERB,**
**PFC. DANIEL NORTH, PTLM.**
**WILLIAM STAUBS, PTLM. PAUL**
**LEHMAN, and PFC. ERIC NEELY,**

      Defendants.

## MEMORANDUM OPINION AND ORDER GRANTING
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pending before the Court is the Defendants' Motion for Summary Judgment [ECF No. 222], filed on July 6, 2018. The Plaintiff filed an Opposition to Defendants' Motion for Summary Judgment [ECF No. 244] on July 27, 2018. The Defendants filed a Reply Brief [ECF No. 254] on August 10, 2018. Accordingly, the matter has been fully briefed and is now ripe for review. For the following reasons, the motion must be granted.

### I. Background

#### A. Factual Background

This case arises from the death of Wayne A. Jones. Taking the material facts in the light most favorable to the Plaintiff, the facts are as follows. At approximately 11:30 p.m. on March 13, 2013, Officer Paul Lehman of the Martinsburg City Police

Department was on patrol when he saw Wayne A. Jones walking next to, but not on, the sidewalk of Queen Street. ECF No. 38-1, Defs.' Ex. 15, Lehman Video at 0:00-0:58. West Virginia Code § 17C-10-6(a) and City of Martinsburg Ordinance 371.06(a) prohibit a pedestrian from walking in a street when a sidewalk is available.

After following Jones for approximately one minute, Officer Lehman sounded a horn at Jones to get his attention. ECF No. 244-3 at 4-5; Defs.' Ex. 15, Lehman Video at 1:00. Thereafter, Officer Lehman pulled to the side of the street and asked Jones, "Hey bud what's going on . . . Why you are walking down the middle of the road?" Defs.' Ex. 15, Lehman Video at 1:16-1:23. Jones responded, "I'm trying to get to a distance." Id. at 1:34. At that point, Officer Lehman asked Jones if he had any identification on him. Id. at 1:38. Jones responded that he did not. Id. at 1:46. Officer Lehman then asked Jones if he has any weapons on him, to which Jones responded, "What is a weapon?" Id. at 2:03-2:07. Officer Lehman responded, "Anything. Guns, knives, clubs." Id. at 2:08-2:11. Jones responded that he had "something on him." Id. at 2:12.

Thereafter, Officer Lehman commanded, "Let me see your hands, put your hands on the car," while Jones responded, "What are you trying to do?" Id. at 2:17-2:42. Officer Lehman testified that he drew his taser and gave repeated commands for Jones to put his hands on the vehicle. ECF No. 244-3 at 7. Officer Lehman testified that Jones continued to "gain distance." Id. Although Jones is not visible in the dash cam footage, Officer Lehman testified that Jones "backed himself away onto the sidewalk, towards the buildings." Id. The dash cam footage then shows Officer Lehman moving quickly, presumably in Jones's direction, deploying his taser. Defs.' Ex.

2

15, Lehman Video at 2:47. Approximately 30 seconds later, Officer Daniel North arrived on the scene. Id. at 3:15.

There is no dash cam footage from the time Officer North arrived until shortly before Jones was shot. Piecing together the officers' depositions and the Plaintiff's admissions, it appears the sequence of events is as follows. Officer North responded and observed Jones and Officer Lehman in what appeared to be an argument. Daniel North Dep. 5. Officer Lehman deployed his taser at Jones. Lehman Dep. 7; Defs.' Ex. 15, Lehman Video at 2:47. Officer North then deployed his taser at Jones. North Dep. 5. Jones continued to resist and failed to comply with the officers' commands. Req. for Admis. 10. Jones ran south on Queen Street approximately one block to a bookstore. Lehman Dep. 7; North Dep. 6; Req. for Admis. 7, 8. Officer Lehman called for more backup while Officer North pursued Jones on foot. William Staub Dep. 6.

Officer North caught up to Jones in the entranceway of a bookstore at 145 North Queen Street. North Dep. 6. Officer North ordered Jones to get on the ground. Id. He saw Jones's hands go up and believed that Jones may try to assault him. Id. Officer North swung at Jones, striking him in the neck. Id. By that time, Officer William Staub had arrived on the scene. Staub Dep. 7. Officer Staub ordered Jones to get on the ground. Id. Officer North and Officer Staub grabbed Jones and tried to arrest him. Id. Once they had a hold of Jones, all three men rolled down the stairs of the bookstore. Staub Dep. 8; North Dep. 7. Officer North deployed another taser on Jones, and Officer Staub put him in a choke hold. Id.

By then, Officer Lehman, Officer Eric Neely, and Officer Erik Herb had arrived on the scene. Officer Neely saw Jones resisting Officer Staub's attempts to arrest him.

Officer Neely told Jones he would deploy his taser if Jones did not stop resisting arrest. Eric Neely Dep. 9; Defs.' Ex. 3, Neely Video at 1:19-1:20. Shortly after, Officer Neely deployed his taser on Jones. Neely Dep. 9; Defs.' Ex. 3, Neely Video at 1:27.

While Officer Staub and Jones were on the ground, Jones attempted to stab Officer Staub with a knife. Req. for Admis. 14. Neither party has produced the knife or explained what happened to it. However, the Estate admits that Jones possessed a knife. Req. for Admis. 11. On the dash cam video Officer Staub yelled, "he's got a [ ] knife." Defs.' Ex. 3, Neely Video at 1:28. Another officer yelled, "Where's the knife?" Id. at 1:30. Officer Staub yelled, "It's in his hand." Id. at 1:31. At the same time, an officer yelled "get back, get back." Id. at 1:31-1:34. In the next three seconds, the officers ordered Jones to drop the knife, Jones did not drop the knife, and the officers fired at Jones. Req. for Admis. 12; Req. for Admis. 13; Defs.' Ex. 3, Neely Video at 1:34-1:37. In the three seconds between when the officers released Jones and discharged their firearms, Jones appeared not to be moving. Defs.' Ex. 3, Erik Herb Video 1:01-1:08.

Per the video from Officer Neely's dashboard camera, the shots lasted approximately two seconds and were fired almost simultaneously. Defs.' Ex. 3, Neely Video at 1:38-1:40. The officers fired twenty-two shots at Jones, all of which struck him. The officers discharged rounds as follows: Officer Neely – four rounds, Officer Staub – three rounds, Officer Herb – five rounds, Officer North – two rounds, and Officer Lehman – eight rounds. The bullets hit Jones in the head, neck, arm, elbow, buttocks, back, and chest. After the shooting ended, Officer Neely radioed that shots had been fired and requested emergency medical personnel. Other officers arrived on the scene

4

and administered first aid until the paramedics arrived. The paramedics arrived and attempted to revive Jones. Their attempts failed. Jones died at the scene.

After Jones's death, a state grand jury investigated the incident. Officers Neely, Staub, Herb, North, and Lehman were placed on paid administrative leave. Miller Dep. 67. At first, the officers were required to stay home and attend court hearings as necessary for the grand jury investigation. Id. One month into their leave, the officers were allowed to return to the police station to perform administrative duties, such as maintenance at the station. Id. They were not permitted to take any law enforcement action. Id. In October 2013, the grand jury declined to indict the officers. Following that decision, the officers were permitted to perform law enforcement duties again. Id. at 68.

**B. Procedural Background**

After Jones's death, the administrators of his Estate (Jones's brothers, Robert L. Jones and Bruce A. Jones) filed suit against the City of Martinsburg, West Virginia, the West Virginia Martinsburg Police Department, and Does 1 to 25. ECF No. 1. Their complaint raised four claims under 42 U.S.C. § 1983, a negligence and wrongful death claim, and a claim under West Virginia Code § 61-6-21(b). The Estate requested punitive damages for all claims. On August 19, 2013, the Court entered an agreed order dismissing the Martinsburg Police Department from this case.

On May 20, 2014, the Court granted the Estate leave to amend its complaint. The amended complaint replaced the Doe Defendants with Officers Herb, North, Staub, Lehman, and Neely. It also modified the Estate's claims to the following. The Estate brought two Section 1983 claims against the officers, one under the Fourth Amendment for violating Jones's right to be free from excessive force and a second under the

5

Fourteenth Amendment for violating the right of Jones's family members to maintain a relationship with Jones. The Estate raised a § 1983 claim alleging the City is liable for the officers' constitutional violations. Finally, the Estate maintained a negligence and wrongful death claim against the officers and a West Virginia Code § 61-6-21(b) claim against the City and officers. ECF No. 85. Then, the Court granted the City of Martinsburg's partial motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). The Court dismissed the § 61-6-21(b) claim and the punitive damages sought against the City for the alleged § 1983 violation.

On August 8, 2014, the Defendants filed their motion for summary judgment. ECF No. 119. The Court granted summary judgment as to the § 1983 claims, holding that "the officers did not use excessive force and the Fourteenth Amendment claim is not cognizable." ECF No. 162 at 19. The Court also granted summary judgment on the state law claims, holding that the claims failed as a matter of law. Id. at 19-20. Having granted summary judgment for the Defendants on all claims, the Court dismissed the case.

On October 21, 2015, the Plaintiff appealed the Court's decision to the Fourth Circuit Court of Appeals. ECF No. 165. On March 5, 2018, the Fourth Circuit issued its opinion in which it reversed this Court's holding on the use of excessive force. Specifically, the Fourth Circuit held that "genuine issues of material fact remain which underlie the determination of whether the force the officers used was excessive." ECF No. 215 at 13. Accordingly, the Fourth Circuit remanded the case "for further proceedings" on the Fourth Amendment claim.

Because the Fourth Circuit affirmed the rest of this Court's order granting summary judgment [ECF No. 162], the only claims remaining are the § 1983 claims against the officers and the City of Martinsburg. The Defendants have now filed a new motion for summary judgment [ECF No. 222] on these claims, asking the Court to resolve questions regarding the officers' qualified immunity and the City of Martinsburg's Monell liability.

## II. Standard of Review

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Thus, the Court must conduct "the threshold inquiry of determining whether there is the need for a trial–whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Id. at 250.

The party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., 475 U.S. at 586. That is, once the movant has met its burden to show an absence of material fact, the party opposing summary judgment must then come forward with affidavits or other evidence establishing there is indeed a genuine issue for trial. Fed. R. Civ. P. 56; Celotex Corp., 477 U.S. at 323-25; Anderson, 477 U.S. at 248. "If the

evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249 (citations omitted). A motion for summary judgment should be denied "if the evidence is such that conflicting inferences may be drawn therefrom, or if reasonable men might reach different conclusions." Phoenix Savs. & Loan, Inc. v. Aetna Cas. & Sur. Co., 381 F.2d 245, 249 (4th Cir. 1967); see also id. at 253 (noting that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge").

### III. Discussion

#### A. Qualified Immunity

The Defendants seek summary judgment in favor of the individual officers, arguing that the officers are entitled to qualified immunity.

##### 1. Applicable Legal Standards

The doctrine of qualified immunity serves to protect government officials from civil liability so long as the offending official's conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Qualified immunity serves to balance "two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson v. Callahan, 555 U.S. 223, 231 (2009). The legal question of whether a defendant is entitled to qualified immunity must be decided by the court, not the jury. Willingham v. Crooke, 412 F.3d 553, 560 (4th Cir. 2005).

Courts engage in a two-prong inquiry to determine whether a law enforcement officer is protected by qualified immunity. Yates v. Terry, 817 F.3d 877, 884 (4th Cir. 2016). First, the court must decide whether the facts, taken in the light most favorable to the plaintiff, establish that the officer violated a constitutional right. Saucier v. Katz, 533 U.S. 194, 201 (2001). Second, the court must decide whether that constitutional right was "clearly established" at the time of the officer's alleged misconduct. Id. Courts may exercise their discretion in deciding which of the two prongs should be addressed first, in light of the circumstances presented in a given case. Pearson, 555 U.S. at 236.

Thus, even when the court finds that an official has violated the plaintiff's constitutional rights, the doctrine of qualified immunity "acknowledge[s] that reasonable mistakes can be made as to the legal constraints on particular police conduct." Saucier at 205 (2001). The standard is that an officer is entitled to immunity unless "every reasonable official would have understood that what he is doing violates" the law. Mullenix v. Luna, 136 S. Ct. 305, 308 (2015) (citing Reichle v. Howards, 566 U.S. 658, 664 (2012)). "Put simply, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." Mullenix, 136 S. Ct. at 308 (2015) (citations and quotations omitted).

Although there need not be a case directly on point, "existing precedent must have placed the statutory or constitutional question beyond debate." Id. (citing Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011)). Thus, Courts must be careful not to define clearly established law at a high level of generality—"specificity is especially important in the Fourth Amendment context." Wilson v. Prince George's Cty., 893 F.3d 213, 222 (4th Cir. 2018).

## 2. Analysis

Here, the Fourth Circuit Court of Appeals held that "genuine issues of material fact remain which underlie the determination of whether the force the officers used was excessive." ECF No. 215 at 13. Thus, the Court will assume arguendo that the officers violated Jones's Fourth Amendment right to be free from excessive force and will skip to the second prong of the qualified immunity test—that is, whether "every reasonable official" would have understood that his conduct violated the law. The analysis is based on the Plaintiff's version of the facts. Although a jury "ultimately may find that the officers' version of events is more credible, we are not permitted to make such credibility determinations when considering whether a police officer" is immune from suit. Meyers v. Baltimore Cty., 713 F.3d 723, 733 (4th Cir. 2013). Summarizing the facts in the light most favorable to the Plaintiff, the question becomes:

> Did clearly established law in March 2013 prohibit officers from using deadly force against an individual who: (1) committed a misdemeanor; (2) resisted arrest; (3) fled from officers; (4) possessed a knife; (5) attempted to stab an officer with his knife; (5) refused commands to drop the knife; and (6) was on the ground, motionless at the time he was shot?

Wilson v. Prince George's County is instructive here. In that case, the Fourth Circuit held that, "in October 2012, it was not clearly established that an officer would violate a suspect's Fourth Amendment right to be free from excessive force by shooting a person who: (1) was suspected of having committed a burglary and a battery; (2) was standing about 20 feet from the officer holding a knife, inflicting harm on himself and stumbling, but not threatening others or making sudden movements; and (3) was refusing to obey the officer's repeated commands to drop the knife at the time he was

10

shot." The Fourth Circuit held that the force was unreasonable, but concluded that the officer was entitled to qualified immunity. Wilson, 893 F.3d at 224.

In so holding, the Fourth Circuit reviewed the clearly established law as of October 2012. For example, as of October 2012, "mere possession of a deadly weapon by [an] individual did not justify the use of deadly force." Wilson, 893 F.3d at 222 (citing Cooper v. Sheehan, 735 F.3d 153, 154, 159-60 (4th Cir. 2013). Further, "the use of any unnecessary gratuitous and disproportionate force, whether arising from a gun, a baton, a taser, or other weapon, precludes an officer from receiving qualified immunity *if the subject is unarmed and secured*." Myers, 713 F.3d at 735 (internal citations omitted) (emphasis added). However, when facts indicated that the armed person posed a "threat of harm to the officers or others," deadly force was objectively reasonable. Wilson, 893 F.3d at 222 (citing Anderson v. Russell, 247 F.3d 125, 128, 132 (4th Cir. 2001).[1]

Turning to the facts here, this case is not "an obvious one" and the facts do not squarely align with the established precedent. When Jones was stopped by Officer Lehman, he was engaged in criminal activity, albeit a non-violent misdemeanor. The encounter quickly escalated when Officer Lehman asked Jones if he had a weapon and Jones admitted to having "something." Ultimately, Jones possessed a knife. Jones resisted arrest and fled from the officers. After catching and wrestling Jones to the ground, Jones attempted to stab one of the officers. Almost instantly the officers

---

[1] Although Jones suffered from mental illness, his brother testified that "the average person . . . around [Jones] wouldn't know that he had a mental problem." Robert Jones Dep. 18. Thus, the officers were not on notice that Jones suffered from mental illness. Nevertheless, as of October 2012, it was clearly established that an officer's use of force was unreasonable when a mentally ill individual did not threaten others, verbally or with a weapon. Wilson, 893 F.3d at 223. However, when a mentally ill individual was armed and had committed a crime, use of force may be reasonable. Id.

released Jones, who remained motionless on the ground. In the next four seconds, the officers commanded Jones to drop the knife, Jones lied motionless, and the officers discharged their firearms.

At the time the officers discharged their firearms, Jones was not "secured," as defined by the clearly established law. After realizing that Jones had a knife, the officers released Jones and backed away. While Jones was unmoving, he was not handcuffed, bound, pinned, or secured in a police cruiser, jail cell, or interrogation room. Even assuming that Jones was effectively "secured" when the officers discharged their firearms—in that he was no longer resisting arrest—he still was not secured <u>and</u> unarmed. As in <u>Wilson</u>, Jones was not shot "solely because he had a deadly weapon in his possession." <u>Wilson</u>, 893 F.3d at 222. Rather, "additional facts indicated that [Jones] posed a threat to the officers or others." <u>Id.</u> Namely, Jones had fled, had been resisting arrest, and had attempted to stab one of the officers. Thus, while the force may have ultimately been unreasonable, the clearly established law in March 2013 "fell short of providing sufficient notice" to bar qualified immunity. See <u>Wilson</u>, 893 F.3d at 224.

Accordingly, the Court holds that, in March 2013, it was not clearly established that an officer would violate an individual's Fourth Amendment right to be free from excessive force by shooting a person who: (1) committed a non-violent misdemeanor; (2) resisted arrest and fled from officers; (3) was armed with a knife and attempted to stab an officer; and (4) was lying on the ground motionless at the time the shots were fired. Therefore, the officers are entitled to qualified immunity and summary judgment must be granted.

### B. <u>Monell</u> Liability

Next, the Defendants seek summary judgment in favor of the City of Martinsburg, arguing that the evidence does not support a finding of <u>Monell</u> liability.

#### 1. Applicable Legal Standards

Under <u>Monell</u>, municipalities are not liable for the constitutional violations of their employees solely because of the employment relationship. <u>See</u> <u>Monell v. Dep't of Soc. Serv.</u> 436 U.S. 658, 694 (1978). Rather, the municipality is only liable under § 1983 when "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." <u>Id.</u> To maintain liability based on municipality policy or custom, the plaintiff must identify "persistent and widespread practice of municipal officials, the duration and frequency of which indicate that the policymakers (1) had actual or constructive knowledge of the [mis]conduct and (2) failed to correct it due to their deliberate indifference." <u>Owens v. Baltimore City State's Attorneys Office</u>, 767 F.3d 379, 402 (4th Cir. 2014) (internal citations omitted). "Sporadic or isolated violations of rights will not give rise to <u>Monell</u> liability; only widespread or flagrant violations will." <u>Id.</u> at 403.

When a § 1983 claim is brought against a municipality for failure to train, liability will be imposed "only when such failure reflects deliberate indifference to the rights of its citizens." <u>Doe v. Broderick</u>, 225 F.3d 440, 456 (4th Cir. 2000). In other words, "the need for more or different training" must be "so obvious" and the existing training must be "so likely to result in the violation of constitutional rights" that "the policymakers of the city can be reasonably said to have been deliberately indifferent to the need." <u>City of Canton v. Harris</u>, 489 U.S. 379, 390 (1989). "Only where a failure to train reflects a

deliberate or conscious choice by a municipality . . . can a city be liable for such failure under § 1983." Doe, 225 F.3d at 456.

### 2. Analysis

Here, the Plaintiff alleges that the City of Martinsburg violated Jones's Fourth Amendment right pursuant to the city's custom, policy, or practice. Specifically, the complaint alleges that the City of Martinsburg maintains a policy of "allowing its officers to use excessive and lethal force," "not engaging mental health workers when responding to crisis situations," and failing to properly train its officers. ECF No. 85 at 20.

In support, the Plaintiff alleges that "the facts of this case reveal a desperate need for more or different training." ECF No. 244 at 18. The Plaintiff reiterates the facts leading up to Jones's death and argues that it is "hard to imagine a set of facts more egregious than those [presented here]." Further, the Plaintiff points to discrepancies between the officers' depositions and argues that the officers are "being consciously dishonest" which "reveals a culture within the department that is without question the result of policies or procedures." ECF No. 244 at 22. However, the Plaintiff has not cited any other incidents involving the City of Martinsburg police department and "proof of a single incident of the unconstitutional activity charged is not sufficient to prove the existence of a municipal custom." Semple v. City of Moundsville, 195 F.3d 708, 713-14 (4th Cir. 1999). Thus, even if the officers acted unlawfully or dishonestly in this case, those actions alone are insufficient to prove the existence of a municipal custom or policy.

Additionally, the Plaintiff emphasizes that "[e]ach of the officers refers to his training in supporting his unlawful and unconstitutional actions, revealing that there is a serious deficiency in said training." Id. at 23. For example, Officer Neely testified that they are trained to shoot multiple rounds until the threat is stopped. However, the Plaintiff argues that the threat was stopped when Jones was lying motionless, prior to the shooting. Id. The Plaintiff also points to Officer Herb's testimony that the officers are trained to shoot at center mass and argues that this training must have been deficient "as [Officer] Neely first shot Jones in the face." Id. The Plaintiff highlights several other discrepancies between the officers' testimony regarding their training and the officers' actions in the instant case. However, at best this shows that the officers did not follow their training—not that the training itself was deficient. "That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program . . . [P]lainly, adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable." City of Canton, 489 U.S. at 391. Thus, emphasizing the officers' mistakes in this case does not suffice to impose liability on the City of Martinsburg for failure to train.

Aside from these arguments, the Plaintiff offers no evidence that the City of Martinsburg does not adequately train its police force. The law is clear—a plaintiff cannot "establish municipal liability without submitting proof of a single action taken by a municipal policymaker." Doe, 225 F.3d at 456. Accordingly, the Plaintiff failed to carry its burden of demonstrating a triable issue of fact regarding the adequacy of police training. Furthermore, the Plaintiff did not address its claims that the City of Martinsburg

failed to "engage[ ] mental health workers when responding to crisis situations" or that the City of Martinsburg maintains a policy "of allowing its officers to use excessive and lethal force."  Therefore, pursuant to Monell, the City of Martinsburg cannot be held liable under § 1983 and summary judgment must be granted.

### IV. Conclusion

For the foregoing reasons, the Court **GRANTS** the Defendants' Motion for Summary Judgment.  ECF No. 222.  Accordingly, the Court **DISMISSES** this action **WITH PREJUDICE**.  The Court **ORDERS** that this case be **STRICKEN** from the Court's active docket.  The Court further **ORDERS** that all pending motions be **TERMINATED AS MOOT**.

The Clerk is **DIRECTED** to transmit copies of this Order to all counsel of record herein.

**DATED:** September 7, 2018

GINA M. GROH
CHIEF UNITED STATES DISTRICT JUDGE